UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ILDAR GIMADIEV,

                            Plaintiff,

     -against-                             Civil Action No.
                                                   20-cv-4248 (Block, J.) (Mann, M.J.)

ALEX M. AZAR, II, Secretary,
United States Department of Health
and Human Services, *et al.*,

                            Defendants.

-----------------------------------------------------------x

## DECLARATION OF DR. EMILY PIERACCI
## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
## CENTERS FOR DISEASE CONTROL AND PREVENTION

I, Emily Pieracci, DVM, MPH, make the following declaration under 28 U.S.C. § 1746:

    1) I am a Veterinary Medical Officer in the Division of Global Migration & Quarantine (DGMQ), Centers for Disease Control and Prevention (CDC). CDC is an agency within the U.S. Department of Health and Human Services. The mission of DGMQ includes overseeing the importation of animals and animal products capable of causing human disease at U.S. ports of entry.

    2) I have served in this capacity since June 2019. My duties include reviewing health records of imported live animals regulated by the CDC, assessing animals in need of public health evaluations, developing guidance and research related to animal disease importation risk and risk mitigation strategies, and developing and disseminating evidence-based guidelines and

recommendations to prevent and control the introduction of zoonotic diseases (diseases that spread between animals and people) through U.S. ports of entry.

3) From April 2016- June 2019, I served as veterinary epidemiologist with the CDC Poxvirus and Rabies Branch. My duties included developing guidance and research related to the spread of dog rabies globally, training and implementation of rabies control programs in foreign countries, and dog vaccination program evaluations. I also developed and disseminated evidence-based guidelines and recommendations to prevent and control rabies in the U.S. and abroad.

4) As a public health veterinarian, I have implemented canine rabies elimination programs in multiple African and Asian countries. I have also served as a public health emergency responder for the Ebola outbreaks of 2014 and 2018, and for the 2019 novel coronavirus (COVID-19) outbreak.

5) I received a Bachelor of Science in history and psychology from Western Washington University. I completed my Doctor of Veterinary Medicine at Washington State University and received my Master's in Public Health from Johns Hopkins University. I completed my epidemiology fellowship in the Epidemic Intelligence Service Fellowship ("disease detectives") with the CDC. I am additionally board certified in veterinary preventative medicine.

6) Rabies is nearly 100% fatal in both humans and animals after clinical signs appear. Globally, rabies kills more than 59,000 people a year. It can spread to people and pets if they are bitten or scratched by a rabid animal. In the United States, rabies is mostly found in wild animals like bats, raccoons, skunks, and foxes. However, in many other countries dogs still carry rabies, and most rabies deaths in people around the world are caused by dog bites.

7) While rabies can still be found in wildlife, the elimination of the canine rabies virus variant (CRVV) from the United States in 2007 is considered one of the most important public health successes of the 20th century. CDC estimates that the elimination of CRVV in the United States through canine rabies vaccination resulted in a tenfold decrease in human rabies cases reported from 1938 through 2018. Thus, even one importation of a rabid dog with CRVV threatens to reintroduce this rabies variant into the United States which required millions of dollars and decades of work to eliminate.

8) Approximately, 100,000 dogs enter the United States every year from high-risk rabies countries and only a small portion (approximately 200 in any given year) are denied entry based on inadequate paperwork and for failure to comply with pertinent laws or regulations.

9) In the past 5 years, there have been only 3 rabid dog imports into the United States, all from dogs arriving from high-risk rabies countries (such as the Russia Federation), and all with falsified rabies vaccination certificates.  The Russian Federation is considered a high-risk rabies country.  *See https://www.cdc.gov/importation/bringing-an-animal-into-the-united-states/rabies-vaccine.html*  (last visited September 14, 2020).

10) In addition to the human health risk, responding to cases of imported rabies involves a significant commitment of agency time and resources. Based on an internal assessment awaiting publication, one recent import of a rabid dog involving no dog to human rabies transmission cost an estimated $500,000 in public health response efforts and involved the administration of post-exposure prophylaxis to 44 people, and the animal quarantine of 25 additional dogs.

11) CDC's dog import regulations are enacted under the authority of Section 361 of the Public Health Service Act, 42 U.S.C. § 264, which authorizes the Secretary of Health and Human Services to make and enforce regulations necessary to prevent the introduction,

transmission, and spread of communicable diseases into the United States and from one U.S. state or territory into another. CDC regulations governing the import of dogs may be found at 42 C.F.R. § 71.51.

12) These regulations require that all dogs appear healthy to enter the United States. Furthermore, depending upon what country the dogs are coming from, the CDC requires that the dog be accompanied by a valid rabies vaccination certificate. *See* [https://www.cdc.gov/importation/bringing-an-animal-into-the-united-states/rabies-vaccine.html](https://www.cdc.gov/importation/bringing-an-animal-into-the-united-states/rabies-vaccine.html) (last visited September 14, 2020).

13) All dogs coming from the high-risk countries (such as the Russian Federation) must have a valid rabies vaccination certificate showing they are vaccinated for rabies and fully immunized. It takes 28 days for the rabies vaccine to fully immunize and protect the dog. Any documents must be in English or have a certified English translation and must be filled out by the veterinarian who administered the rabies vaccine. All documents must be complete and accurate at the time of arrival. *See* [https://www.cdc.gov/importation/bringing-an-animal-into-the-united-states/vaccine-certificate.html](https://www.cdc.gov/importation/bringing-an-animal-into-the-united-states/vaccine-certificate.html) (last visited September 14, 2020).

14) As standard practice, the CDC New York Quarantine Station (NYQS) collaborates with U.S. Customs and Border Protection (CBP) in reviewing documents of dogs arriving as baggage (checked and hand-carried) at John F. Kennedy International Airport (JFK).

15) On September 8, 2020, the CBP alerted the CDC NYQS that a single passenger, Mr. Ildar Gimadiev, had declared nine dogs arriving on Aeroflot Airlines flight 102 from the Russian Federation. Of the nine dogs declared by the passenger, five of the dogs were larger breeds brought in hard-sided carriers as checked baggage, two were small breeds brought in hard-side

carriers as checked baggage, and two of the dogs were small breeds hand-carried in a single, soft-sided carrier.

16) Upon information and belief, Mr. Gimadiev is a U.S. citizen who resides in Russia and has previously attempted to import a dog into the United States from the Russian Federation.

17) On July 28, 2020, Mr. Gimadiev attempted to import a live dog as baggage through JFK. Upon information and belief, Mr. Gimadiev imported the dog on behalf of a buyer in the United States identified as Ms. Rose Ann Flagiello. The dog was denied entry based on missing veterinary information on the rabies vaccination certificate. An appeal of this denial decision was submitted by both Mr. Gimadiev and Ms. Flagiello. CDC denied the appeal on July 31, 2020, and the dog was returned to Russia.

18) CDC's appeal denial letter of July 31 advised Mr. Gimadiev to ensure that dogs imported from high-risk countries (such as the Russian Federation) arrive with valid rabies vaccination certificates that are in English or accompanied by a certified English translation. The appeal denial letter further advised Mr. Gimadiev that any future imports of dogs into the United States that did not comply with CDC regulations would be denied entry and returned to the country of origin at the importer's expense.

19) Upon information and belief, CBP requested that Mr. Gimadiev produce documentation for the nine declared dogs upon his arrival at JFK on September 8, 2020.

20) A CDC Quarantine Public Health Officer (QPHO) reviewed these documents remotely. Upon review of the documents, the CDC QPHO determined that the documents may have been fraudulent based on inconsistencies between the Certificates of Veterinary Inspection and Rabies Certification, and the Pet Passports and requested my consultation along with another CDC Veterinary Medical Officer. My review of these documents raised a similar suspicion that they

may have been falsified based on inconsistent signatures and dates of supposed rabies vaccination.

21) Among the inconsistencies noted, a veterinarian by the name of Margarita Antonova was documented as having administered rabies vaccine to five of the dogs but had two different veterinary stamps and three different signatures on five documents. Another veterinarian listed as Veronika Shishkina was documented as having administered rabies vaccination to two of the dogs but also had two different veterinary stamps and two different signatures. Another veterinarian listed as Nikita Shilayner on one of the Certificates of Veterinary Inspection and Rabies Certification also had a signature that closely resembled the signature of Veronika Shishkina. Lastly, one dog had a different date of rabies vaccination on the pet passport and on the Certificate of Veterinary Inspection and Rabies Certification. *See* Exhibit A, Documents Presented by I. Gimadiev at JFK.

22) The NYQS and CBP requested that the air carrier, Aeroflot Russian Airlines, have the baggage post-entered (i.e., amend the air manifest to declare the items as cargo) and transferred to the kennel facility (known as "the ARK") at JFK, portions of which have been designated by CBP as a bonded storage center, for further evaluation of the documentation. *See* *http://arkjfk.com/biosecurity/*. The ARK is a container freight station (CFS) at JFK, which is facility licensed by CBP to have custody of merchandise. The ARK serves as a temporary holding location for live animals while they are being processed by CBP, the CDC, USDA, the Fish and Wildlife or other agencies. The ARK was principally established as a "one stop shop" for handling both imported and departing livestock and horses. The ARK also has the ability to handle other pets such as canine and feline pets as well as servicing aviary needs. The ARK offers in-transit companion animal care, in-transit avian and small-mammal handling, equine

6

export, and equine import quarantine. Pets, horses, birds, and exotic animals are transported from aircraft, terminals, cargo facilities and other airport locations, to be cared for by ARK animal care and veterinary staff.

23) Upon information and belief, while unloading two small dogs from the soft-sided carrier, the ARK-employed animal handler noticed the bag was still heavy after removing the two dogs. Upon further assessment, the bag was found to have a partition and another side. When the opposite side of the carrier was exposed, two additional dogs were discovered (both alive and apparently healthy).

24) Upon information and belief, the two additional dogs were not declared to CBP and arrived with no documentation. Aeroflot Russian Airlines was notified of the additional dogs and confirmed that Mr. Gimadiev had only declared nine dogs to the airline. A separate post-entry was requested for the additional undeclared dogs. The CDC NYQS denied entry to all 11 dogs based on 42 C.F.R. § 71.51.

25) On September 8, 2020, the CDC NYQS provided Mr. Gimadiev with a denial of entry letter, the CDC Disposition Form for Baggage and Cargo for the nine declared dogs, and the CDC Disposition Form for Baggage and Cargo for the two undeclared dogs (the "Dispositions"). Annexed as Exhibit B is a true and correct copy of the Dispositions.

26) The next day, September 9, Mr. Gimadiev submitted an appeal of the denial of entry stating as grounds his belief that all the paperwork had been in order. Annexed as Exhibit C is a true and correct copy of Mr. Gimadiev's appeal of the denial of entry.

27) On September 10, 2020, CDC denied the appeal from the initial denial of entry determination. The appeal denial stated that CDC has reviewed the case and determined that two dogs had been found in a hidden compartment of the carry-on animal carrier that had been not

declared to CBP.  Annexed as Exhibit D is a copy of the CDC appeal denial letter dated September 10, 2020.

28) Additionally, the appeal denial letter stated that CDC had reason to believe that documents associated with this shipment may have been falsified based on several discrepancies in paperwork. The stamp and signature of the veterinarian on the pet passport and on the Certificate of Veterinary Inspection and Rabies Certification for one dog did not match. One veterinarian with the same name had two different stamps and signatures in the documents for two of the dogs. Two different veterinarians had the same signature. Lastly, one dog had a different date of rabies vaccination on the pet passport and on the Certificate of Veterinary Inspection and Rabies Certification. Therefore, the appeal was denied.

29) CDC has not granted the dogs entry into the United States and the dogs remain at the ARK at JFK. The ARK is the only CBP-bonded facility in the country for housing dogs that have been denied entry into the United States.

30) Upon information and belief, the ARK has limited capacity to house dogs denied entry into the United States for any extended period beyond a few days. The ARK has communicated with CDC via email and phone and noted that several of the dogs have begun to show aggression toward the ARK staff. The ARK has requested they be promptly removed from the facility for the safety and welfare of the ARK staff. Upon information and belief, as of September 14, all 11 dogs currently held at the ARK are fit for travel on the next available flight to Russia on or about September 17, 2020.

31) On September 13, 2020, CDC Regional Officer in Charge, LCDR Matthew Palo, spoke with the Aeroflot Cargo Manager for JFK, Anna Sanyosan. Upon information and belief, Ms. Sanyosan communicated to Mr. Palo that she had contacted the individuals listed as the

8

"exporter" on each of the "Certificate of Veterinary Inspection and Rabies Certification" for these dogs. Upon information and belief and based on Ms. Sanyosan's representations, the exporters of record for the 9 declared dogs would be willing to accept these dogs if returned to Russia. While not confirmed by CDC, there is no reason to suspect that the same exporter would be unwilling to accept the 2 additional undeclared dogs concealed in Mr. Gimadiev's carry-on baggage.

32) It is my professional judgment that, contrary to Mr. Gimadiev's assertion, these dogs would be highly unlikely to be euthanized or suffer any harm if returned to the Russian Federation because this is not common practice for any country accepting goods (live dogs) denied entry into the United States.

33) Upon information and belief, the International Pet and Animal Transportation Association works globally to assist importers with live animal shipments. Local animal care companies can also be hired by Mr. Gimadiev to pick the dogs up at the airport in Russia and transfer them to a safe location if needed ([www.ipata.org](www.ipata.org)).

34) It is my professional judgement that allowing these dogs to remain in the United States under the terms of a confinement agreement would be inappropriate and detrimental to public health interests. In the recent past, confinement agreements have only been issued under extraordinary circumstances when dogs are unable to be returned to the country of origin due to severe medical issues or prolonged periods of unavailability between flights. These factors are not present here.

35) Additionally, a confinement agreement requires that a dog be vaccinated for rabies and quarantined for 28 days within an enclosed area identified by the importer and approved by the CDC. The dog is not permitted to leave the enclosure except for medical reasons or for brief

walks on a leash. Based on Mr. Gimadiev's apparent concealment and failure to declare two dogs upon entering the United States, he cannot be trusted to abide by the terms of a confinement agreement.

36) Additionally, confinement agreements typically require 4-6 months of follow-up by state and local health departments to ensure the dog is healthy and has not shown any signs of rabies. Currently, health departments are overwhelmed with demands due to the COVID-19 pandemic and do not have the resources to monitor these dogs.

37) Upon information and belief, Mr. Gimadiev is acting only as a "transporter" of these dogs and eight of the dogs have owners other than Mr. Gimadiev. The confinement agreements would require potentially tracking these dogs across multiple states and various owners.

38) In accordance with 28 U.S.C. § 1746, I declare, under penalty of perjury, that the above information is true and correct to the best of my knowledge and belief.

Signed this 14th day of September 2020.

/s Emily Pieracci

Emily Pieracci, DVM
Veterinary Medical Officer
Zoonoses Team Lead
Division of Global Migration & Quarantine
Centers for Disease Control and Prevention